(No. 13048.—Judgment modified and affirmed.)

THE STATE PUBLIC UTILITIES COMMISSION *ex rel.* The City of Springfield, Appellant, *vs.* THE SPRINGFIELD GAS AND ELECTRIC COMPANY, Appellee.

*Opinion filed December 17, 1919—Rehearing denied Feb. 6, 1920.*

1. PUBLIC UTILITIES—*extent to which courts will review exercise of rate-making power.* The power of rate regulation is essentially legislative, and its exercise will be reviewed by the courts only to determine whether the rate-making body acted within the scope of its authority, or the order is without substantial foundation in the evidence, or a constitutional right of the utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay the cost of operating expenses and give the utility a reasonable return on the present value of its property.

2. SAME—*when an order of commission fixing rates cannot be set aside.* If an order of the Public Utilities Commission fixing rates does not contravene any constitutional limitation, is within the power of the commission and has a substantial basis in the evidence, it cannot be set aside by the courts at the suit of the utility as being unreasonable.

3. SAME—*rate fixed must be fair both to utility and the public.* A public utility is entitled to demand a rate which will yield a fair return on the value of the property used by it for public convenience and not merely a rate which is non-confiscatory; but the public, also, is entitled to demand that the rate be no more than the service rendered is reasonably worth, and hence a rate fixed by the Public Utilities Commission must be fair both to the utility and the public.

.291 — 14

4. SAME—*what is a reasonable rate is not a question of legal formula.* What is a just and reasonable rate for the service rendered by a public utility is a question of sound business judgment based upon the evidence and is not one of mere legal formula.

5. SAME—*fair present value of property of utility is the basis of rate-making calculations.* The basis of all calculations as to the reasonableness of the rate to be charged by a public utility is the fair present value of the property used by the utility for the convenience of the public.

6. SAME—*what should be considered in determining fair value of property.* In determining the fair value of the property of a public utility, the original cost of construction, the amount expended on permanent improvements, the present cost of construction, probable earning capacity of the property under existing rates and the sum required for operating expenses are all matters for consideration, and the cost of reproduction, less depreciation, is not the only equitable basis for determining such value.

7. SAME—*"going value" of utility should be considered.* The Public Utilities Commission, in fixing a rate to be charged by a public utility for gas, should consider, among other elements, the "going value" of the utility, and though this element is one which cannot be determined with mathematical certainty, it is necessary that the finding show due consideration was given to such element.

8. SAME—*the exchange value of property should not be considered.* The exchange value of the property of a public utility is measured by the return and should not be considered by the Public Utilities Commission in determining the value of the property for the purpose of fixing a fair and reasonable rate.

9. SAME—*what is not ground for holding rates unreasonable.* If the graduated rates fixed by the Public Utilities Commission for gas will together produce a reasonable return to the company the rates will not be held to be unreasonable and unfair on the ground that the cost of supplying gas to the small consumer is in excess of the rate fixed therefor and that the burden of producing the return to the company thereby rests on the large consumers.

10. SAME—*when finding should show amount allowed for certain item.* Where it appears from the finding of the commission in valuing the property of a gas company for rate-making purposes, that only a portion of the value of a large item, such as a million-foot gas holder, was considered by the commission, then the finding must show what proportion of the whole value of such item, as shown by the evidence, was allowed by the commission.

11. SAME—*return of seven per cent is not necessarily arbitrary or unreasonable.* The question as to what shall be regarded as a reasonable return to a public utility is largely one of fact to be determined by the evidence in each particular case, but a rate of seven per cent fixed by the Public Utilities Commission as a fair return on the value of the property of a gas company having a monopoly of the business in a fair-sized city will not be regarded as arbitrary or unreasonable.

12. SAME—*commission is not bound to accept company's showing as to operating expenses.* In determining the value of the property of a gas company as a basis for fixing rates, the Public Utilities Commission is not bound to accept the figures of the company as to what portion of the cost of gas is due to operating expenses but may consider evidence as to the average operating expenses of such companies in other cities similarly situated, with other evidence on the subject, and its finding in that respect will not be set aside unless it is against the manifest weight of the evidence.

13. SAME—*findings of commission should disclose specific valuations of elements considered.* To enable the courts intelligently to review the order of the commission in a rate-making case the findings of the commission should disclose the ultimate conclusions of the commission as to the specific valuations of the elements considered by it in arriving at the fair present value of the property.

14. SAME—*when order of commission will not be set aside.* If the final order of the commission in a rate-making case is not against the manifest weight of the evidence it will not be set aside merely on the ground that one or more of the items may be regarded as too high or too low, as the court will base its decision on the final result of the commission's findings.

APPEAL from the Circuit Court of Sangamon county; the Hon. NORMAN A. JONES, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, GEORGE T. BUCKINGHAM, MATTHEW MILLS, and ALBERT D. RODENBERG, for the Utilities Commission.

STEVENS & HERNDON, for the city of Springfield.

FRANK J. QUINN, and PHILIP BARTON WARREN, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This appeal is prosecuted to reverse the judgment of the circuit court of Sangamon county setting aside an order of the Public Utilities Commission entered March 9, 1916, in a proceeding begun January 12, 1914, by petition of the city of Springfield. The city complained that the rates charged for gas by appellee were unjust and asked that the commission investigate and fix a just and reasonable rate. May 1, 1914, was fixed as the time to which valuation of the appellee's property should relate. During the two years this matter was before the commission twenty-four separate hearings were held, consuming sixty-two days of time. More than 10,000 pages of testimony were taken and hundreds of exhibits were received as evidence. The net rates complained of were one dollar a thousand cubic feet for the first 10,000 cubic feet of gas consumed a month, ninety cents for the next 10,000, eighty cents for the next 30,000, seventy-five cents for the next 50,000, seventy cents for the next 50,000, sixty-five cents for the next 50,000, and sixty cents for all over 200,000. The commission filed an opinion in which it reached a decision establishing a net rate of eighty cents a thousand cubic feet for the first 10,000 cubic feet of gas consumed a month, seventy-five cents for the next 10,000, seventy cents for the next 30,000, sixty-five cents for the next 150,000, and sixty cents for all over 200,000. These rates were based on a seven per cent net return on a valuation of $800,000, the commission deciding that fifty cents a thousand was a reasonable operating expense. In setting aside the order of the commission the circuit court found that in fixing the value of the appellee's property for rate-making purposes the commission had wholly excluded an item of $250,000, known as "going value;" that the commission did not give appellee sufficient credit for a new million-foot gas holder; that the classification of rates discriminates between users, because the rates

fixed by the commission require that that part of the gas sold to the small consumer be sold at a loss and that the profits of the company must all come from that part sold to the large consumer, which is only about one-third of the total amount of gas sold by appellee, and that the commission acted contrary to the manifest weight of the evidence in fixing the total operating expense at fifty cents a thousand.

The question presented for us to determine is whether the commission proceeded legally in establishing the rates, and whether its conclusion that the rates established are just and reasonable is supported by the evidence. In order to determine this question it is necessary to determine what elements shall be considered in fixing the value for rate-making purposes, what methods shall be used in determining the value of these several elements for this purpose, and what shall be considered a fair and reasonable return on the value so ascertained. It will also be necessary for us to determine to what extent this court will review the decisions of the Public Utilities Commission.

The law is settled in this State that the matter of rate regulation is essentially one of legislative control. The fixing of rates is not a judicial function, and the right to review the conclusion of the legislature or of an administrative body, acting under authority delegated by the legislature, is limited to determining whether or not the legislature or the administrative body acted within the scope of its authority, or the order is without substantial foundation in the evidence, or a constitutional right of the utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay the cost of operating expenses and give the utility a reasonable return on the present value of its property. (*Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 268 Ill. 49; *Public Utilities Com.* v. *Chicago and West Towns Railway Co.* 275 id. 555.) The Public Utilities act gives the courts power to determine whether or not evidence has been properly re-

ceived or rejected and whether there is sufficient evidence in the record to support the finding of the commission. If the order does not contravene any constitutional limitation and is within the constitutional and statutory authority of the commission and has a substantial basis in the evidence it cannot be set aside by the courts. The court is without authority to set aside such an order unless it is against the manifest weight of the evidence. (*Public Utilities Com.* v. *Terminal Railroad Ass'n,* 281 Ill. 181; *Public Utilities Com.* v. *Toledo, St. Louis and Western Railroad Co.* 286 id. 582; *Chicago Bus Co.* v. *Chicago Stage Co.* 287 id. 320; *Public Utilities Com.* v. *Chicago, Milwaukee and St. Paul Railway. Co.* 287. id. 412.) In *People* v. *McCall,* 219 N. Y. 84, 113 N. E. 795, it was said: "The court has no power to substitute its own judgment of what is reasonable in place of the determination of the Public Service Commission, and it can only annul the order of the commission for the violation of some rule of law. The Public Service Commissions were created by the legislature to perform very important functions in the community, namely, to regulate the great public service corporations of the State in the conduct of their business and compel those corporations adequately to discharge their duties to the public and not to exact therefor excessive charges. It was assumed, perhaps, by the legislature that the members of the Public Service Commissions would acquire special knowledge of the matters intrusted to them by experience and study, and that when the plan of their creation was fully developed they would prove efficient instrumentalities for dealing with the complex problems presented by the activities of these great corporations. It was not intended that the courts should interfere with the commissions or review their determinations further than is necessary to keep them within the law and protect the constitutional rights of the corporations over which they were given control." This interpretation was approved by the Supreme Court of the

United States in *People* v. *McCall,* 245 U. S. 345; 38 Sup.
Ct. 122.

The statute governing and the practice before the State
Public Utilities Commission with respect to rate cases are
substantially the same as the statute and procedure govern-
ing the hearing of such cases before the United States In-
terstate Commerce Commission. (*Public Utilities Com.* v.
*Terminal Railroad Ass'n, supra; Wishkah Boom Co.* v.
*Greenwood Timber Co.* (Wash.) 171 Pac. 234.) In *Inter-
state Commerce Com.* v. *Union Pacific Railroad Co.* 222
U. S. 541, (32 Sup. Ct. 108,) the Supreme Court of the
United States said: "In determining these mixed questions
of law and fact the court confines itself to the ultimate ques-
tion as to whether the commission acted within its power.
It will not consider the expediency or wisdom of the order,
or whether, on like testimony, it would have made a simi-
lar ruling. 'The findings of the commission are made by
law *prima facie* true, and this court has ascribed to them
the strength due to the judgments of a tribunal appointed
by law and informed by experience.' (*Illinois Central Rail-
road Co.* v. *Interstate Commerce Com.* 206 U. S. 441.) Its
conclusion, of course, is subject to review, but when sup-
ported by evidence is accepted as final; not that its decision,
involving, as it does, so many and such vast public interests,
can be supported by a mere scintilla of proof, but the courts
will not examine the facts further than to determine whether
there was substantial evidence to sustain the order." In the
Minnesota rate cases, (*Simpson* v. *Shepard,* 230 U. S. 352,
33 Sup. Ct. 729,) it is said: "The rate-making power is
a legislative power and necessarily implies a range of legis-
lative discretion. We do not sit as a board of revision to
substitute our judgment for that of the legislature, or of
the commission lawfully constituted by it, as to matters
within the province of either."

It is clear from the salary fixed for the commissioners
and the great power vested in the commission by the Pub-

lic Utilities act that the legislature intended to create an office of dignity and great responsibility. It is therefore, not to be expected that through fear of popular disfavor the commission will coyly toy with the situation. It sits to administer justice to individual and corporation, the weak, the strong, the poor, the wealthy, indifferently, fearing none and fawning on none. The notion that commissions of this kind should be closely restricted by the courts and that justice in our day can only be had in courts is not conducive to the best results. There is no reason why the members of the Public Utilities Commission of this State should not develop and establish a system of rules and precedents as wise and beneficial, within their sphere of action, as those established by the early common law judges. All doubts as to the propriety of means or methods used in the exercise of a power clearly conferred should be resolved in favor of the action of the commissioners in the interest of the administration of the law. There should be ascribed to them the strength due to the judgment of a tribunal appointed by law and informed by experience. *Illinois Central Railroad Co.* v. *Interstate Commerce Com.* 215 U. S. 452, 30 Sup. Ct. 155; *State* v. *Public Service Com.* (Mo.) 194 S. W. 287; *Missouri, Kansas and Texas Railway Co.* v. *Norfolk,* (Okla.) 107 Pac. 172; *Minneapolis, St. Paul and Sault Ste. Marie Railway Co.* v. *Railroad Com.* 136 Wis. 146, 116 N. W. 905.

The rate established must be just and reasonable, both to the public and to the utility. In *Public Service Gas Co.* v. *Utility Comrs.* 84 N. J. L. 463, (87 Atl. 651,) it is said that a just and reasonable rate can never exceed,—perhaps can rarely equal,—the value of the service to the consumer, and on the other hand it can never be made by compulsion of public authority so low as to amount to confiscation; that a just and reasonable rate must therefore certainly fall between these two extremes, so as to allow both sides to profit by the conduct of the business and the improvement

of methods and increase of efficiency; that justice to the consumer, ordinarily, would require a rate somewhat less than the full value of the service to him, and justice to the company would ordinarily require a rate above the point at which it would become confiscatory; that to induce the investment and continuance of capital there must be some hope of gain commensurate with that realizable in other business, and that the mere assurance that the investment would not be confiscated would not suffice.   Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment.   (*Brymer* v. *Butler Water Co.* 179 Pa. St. 331, 36 Atl. 249.)   Generally speaking, a rate which is non-confiscatory would not be so unjust and unreasonable as would authorize setting aside the decision of the commission fixing such a rate, (*Public Utilities Com.* v. *Toledo, St. Louis and Western Railroad Co.* 267 Ill. 93; *Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 267 id. 544,) and yet there is a difference between a rate which is merely non-confiscatory and one which is just and reasonable, and it is the just and reasonable rate which the commission is called upon to fix. The utility is entitled to ask a fair return upon the value of that which it employs for public convenience, but, on the other hand, the public is entitled to demand that no more be exacted from it than the services rendered are reasonably worth.   (*Smyth* v. *Ames,* 169 U. S. 466, 18 Sup. Ct. 418; *San Diego Land and Town Co.* v. *National City,* 174 U. S. 739, 19 Sup. Ct. 804; *San Diego Land and Town Co.* v. *Jasper,* 189 U. S. 439, 23 Sup. Ct. 571; *Stanislaus County* v. *San Joaquin and King's River Canal and Irrigation Co.* 192 U. S. 201, 24 Sup. Ct. 241; *Chicago Union Traction Co.* v. *City of Chicago,* 199 Ill. 579.)   The property of the public utility is devoted to the public use.   There is always the obligation springing from the nature of the business in which it is engaged,—which private exigency may not be permitted to ignore,—that there

shall not be an exorbitant charge for the service rendered. But the State has not seen fit to undertake the service itself, and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection, which extends not merely to the title but to the right to receive just compensation for the service given to the public. (*Simpson* v. *Shepard, supra.*) No direct parallel can be drawn between a private corporation and a public service corporation, for the reason that to a greater or lesser extent the public has acquired an interest in the use of the property devoted to public use, and correlatively the company owes a duty to the public as well as to its stockholders and must charge no more than a reasonable rate for service rendered. *Havre de Grace and Perryville Bridge Co.* v. *Towers,* (Md.) 103 Atl. 319.

The difficulty is that which is always present—to ascertain a standard by which this justice and reasonableness shall be gauged. The necessity of public regulation of rates arises out of the monopoly of the public service company. The unregulated price of the service ceases, except so far as some substitute for the particular service may be found, to be determined by competition, and the individual consumer is unable to contract on equal terms. Fixing rates by public authority may secure to each individual the advantage of collective bargaining by or in behalf of the whole body of consumers and result in such a rate as might properly be supposed to result from free competition if free competition were possible. A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. (*Public Service Gas Co.* v. *Utility Comrs. supra.*) Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before. That it is not a question of legal formula is shown by a decision of the

United States Supreme Court in *San Diego Land and Town Co.* v. *Jasper, supra,* that a rate may be reasonable although it fails to produce an adequate return to the public service company, owing to the fact that the business has not developed sufficiently to be remunerative or to the fact that the plant is on a larger scale than is justified by the present demand. The real test of the justice and reasonableness of any rate seems to be that it should be as low as possible and yet sufficient to induce the investment of capital in the business and its continuance therein. This, also, is a business question and depends on the opportunities that may be offered for more profitable investments and the risk involved. In determining the justice and reasonableness of rates, perhaps no better test can ordinarily be found than the rates customarily charged in localities similarly situated. And yet this test is not by any means infallible. What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense. *Duluth Street Railway Co.* v. *Railroad Com.* (Wis.) 152 N. W. 887.

Appellee contends that the only equitable basis for determining value for rate-making purposes is the cost of reproduction new, less depreciation. This contention cannot be sustained. The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a public utility under legislative sanction must be the fair value of the property being used by it for the convenience of the public, and in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the present cost of construction, the probable earning capacity of the property under the particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration and are to be given such weight as may be just and right in each case. *Smyth* v. *Ames, supra; San Diego Land and Town Co.* v. *National City, supra; Stanislaus*

*County* v. *San Joaquin and King's River Canal and Irrigation Co. supra; Chicago Union Traction Co.* v. *City of Chicago, supra; Duluth Street Railway Co.* v. *Railroad Com. supra.*

In *Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, (29 Sup. Ct. 148,) it was said: "The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company. * * * The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years. The items composing the plant depreciate in value from year to year in a varying degree. Some pieces of property, like real estate for instance, depreciate not at all, and sometimes, on the other hand, appreciate in value. But the reservoirs, the mains, the service pipes, structures upon real estate, stand-pipes, pumps, boilers, meters, tools and appliances of every kind, begin to depreciate with more or less rapidity from the moment of their first use. It is not easy to fix at any given time the amount of depreciation of a plant whose component parts are of different ages, with different expectations of life."

In *Willcox* v. *Consolidated Gas Co.* 212 U. S. 19, (29 Sup. Ct. 192,) it was held that there must be a fair return upon the reasonable value of the property at the time it is being used for the public; that such a value was largely a matter of opinion; and that, added to this indefinite basis, is the further uncertainty of whether or not the reduced rate will increase consumption. It was further said that the value of the property is to be determined as of the time when the inquiry is made of the rates, and if the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is, as a general rule, entitled to the benefit of such increase. This would not be true, however, where the property had increased so enormously in value as to render a rate permitting a reasonable return upon such increased value unjust to the public. So in *Denver* v. *Denver Union*

*Water Co.* 246 U. S. 178, (38 Sup. Ct. 278,) it was held that it was proper to estimate complainant's property on a basis of present market values as to land, and reproduction cost, less depreciation, as to structures, but it was not held that this was the only proper basis on which to fix values for rate-making purposes.

In discussing a just and reasonable valuation for rate-making purposes the Supreme Court of Maryland in *Havre de Grace and Perryville Bridge Co.* v. *Towers, supra,* said: "In reaching this there are many factors to be considered. A partial enumeration of these would include the value of the property employed; the value of the service rendered to the user; whether or not the corporation enjoyed a monopoly; the rate of return which should be made to the stockholders after the payment of operating expenses, upkeep and fixed charges; a reasonable allowance for depreciation; whether or not the utility is in operation or *in fieri;* the risk incurred by those who began the undertaking and others which may arise out of the peculiar nature of the utility which is being operated.  *  *  *  The real point to be ascertained was not what it had cost either the railroad company to build the bridge or the incorporators of the bridge company to acquire it, but what was its fair value at the time of the investigation by the commission. In a number of cases recourse has been had to this line of inquiry for a similar purpose, but the value testified to of such a structure is only one of the factors to which consideration must needs be given in such a proceeding, and the reproduction value is liable to be increased from other consideration and diminished by various allowances.  *  *  *  The big difference between the engineers who were figuring on reproduction costs is to be found in the estimated cost of certain materials and labor, Mr. Phelps taking an average cost before the great increase in prices of materials had taken place and Mr. Stuart using the figures as they are at the

present time. Neither of these represented normal conditions, and, therefore, neither was entirely fair or just."

It would be equally as unfair to the consumer to fix the rate at a figure which would produce a reasonable income on a value determined by the cost of reproduction new at a time when cost of construction was abnormally inflated, as it would be unfair to the public utility to compel it to serve the public for a rate that would produce a reasonable income on a value determined by cost of reproduction new at a time when the cost of construction was abnormally low. Therefore it cannot be laid down as a rule without qualifications that cost of reproduction new, less depreciation, is the only basis of valuation for rate-making purposes. It is equally true that the original cost of construction, less depreciation, cannot be held to be the only proper basis for determination of valuation for rate-making purposes. As we have pointed out heretofore in this opinion, the weight of authority is that every element having any bearing on the situation must be considered in the investigation and then sound business judgment applied to the determination of a valuation that is fair and just to the consumer and the utility. Each case must be considered on its own merits and such result of value arrived at as may be just and right in each case. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. We consider any value a fair value which fair and reasonable men would say ought to be attached to the property, under all the circumstances of the particular case, for the purpose of measuring a return which the public should pay to the owner.

The element of value which is the subject of serious contention between the parties to this litigation is what is known as "going value." In view of the settled law on this subject the question is no longer open to discussion. That a going concern has a value over and above the value of the physical property employed is self-evident. From the

nature of this element of value it cannot be arrived at with mathematical accuracy but must necessarily be considered in the light of the facts of each particular case. The solution of the problem is one peculiarly within the province of the commission, and this court will not substitute its judgment for that of the commission if the commission has considered the element of going value in reaching its decision. This conclusion finds support in the following among other authorities:

"It is necessary, therefore, to determine, first, whether any allowance at all for going value is proper. We think, both on weight of authority and on reason, there should be such an allowance. The cost of a gas plant includes not merely the loss of interest while the plant is in course of construction and is building up a paying business, but, even in the case of an old-established plant for the manufacture and distribution of a commodity to the use of which the public has become so accustomed that it seems a necessity, there must be loss while pipe lines are extended to await the coming of consumers as the city extends.. There is the cost of securing and retaining customers; of encouraging the greater use of gas for fuel and for light by the introduction of new and improved appliances; the necessary loss attending experiments that promise improvement; the obsolescence of plant apart from that ordinary, calculable depreciation which may be charged to current expenses instead of being capitalized; the expense that must attend and the additional value that arises from the uniting of separate concerns and the organization of a great industry with a view to economical production, and the cost of procuring capital for the original works or subsequent extensions. What items should be charged to construction, what to business development, how much to current expenses and how much to permanent investment of capital are all most important practical business questions. However these questions may be solved, all these expenses must be met.

Whether they shall be met at the expense of present consumers by being charged at once to current expenses, thus reducing the net return and making necessary a higher rate, or whether they shall be capitalized in whole or in part and constitute a permanent addition to capital or be capitalized and gradually amortized, are business questions. The legal question is whether these items constitute a going value upon which the company is entitled to a return if the individual rate is to be just and reasonable. To this we answer yes. The argument addressed to us on the other side is that all the so-called going value appears in the valuation of the physical plant at the cost of reproduction. The suggestion is that unless there was going value the physical plant would be mere junk, and that the difference between the valuation of the physical plant at its cost of reproduction and its valuation as junk is the true going value. The argument seems to us specious rather than sound. We think that if by value we mean what the economists call exchange value, then a buyer would undoubtedly give more for a plant already doing a profitable business, than for a plant of equal cost, capacity and future possibilities but without the established business. To a purchaser the assurance of an immediate return is worth paying for. * * * The fallacy of the argument on behalf of the cities is, that it requires the investor to suffer all the loss if the enterprise fails and deprives him of the chance of additional gain if the enterprise succeeds; and it fails to allow any recompense for the skill shown in developing and conducting the business, or even for the value of experience, which is proverbially expensive. * * * The value of an assembled and united plant may be greater than the total value of the separate parts." *Public Service Gas Co. v. Utility Comrs. supra.*

"That there is an element of value in an assembled and established plant doing business and earning money, over one not thus advanced, is self-evident. This element of

value is a property right and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use. Each case must be controlled by its own circumstances, and the actual question here is: In view of the facts found and method of valuation used by him, did the master sufficiently include this element in determining the value of the property of this company for rate-making purposes? Included in going value, as usually reckoned, is the investment necessary to organizing and establishing the business, which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had long carried on business in the city of Des Moines under other ordinances and at higher rates than the ordinance in question established. For aught that appears in this record these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business. * * * If return is to be regarded beyond that compensation which a public service corporation is entitled to earn upon the fair value of its property, the right to regulate is of no moment, and income to which the corporation is not entitled would become the basis of valuation in determining the rights of the public. When, as here, a long established and successful plant of this character is valued for rate-making purposes, and the value of the property fixed, as the master certifies, upon the basis of a plant in successful operation, and overhead charges have been allowed for the items and in the sums already stated, it

cannot be said, in view of the facts in this case, that the element of going value has not been given the consideration it deserves." *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 35 Sup. Ct. 811.

"The sum of $100,000 was included by these witnesses as enhancement of value by reason of being a going concern. As previously intimated, the value of the plant is to be estimated in its entirety rather than by the addition of estimates on its component parts, though the latter course will materially aid in determining the value. Advantages have accrued through the sagacity of its management, as contended by appellant. So, too, there are the inevitable mistakes which would not be likely in the construction of a new plant; but to put a new plant in profitable operation time would be required, and, aside from the intangible element of good will, the fact that the plant is in successful operation constitutes an element of value. As said, the value of the system as completed, earning a present income, is the criterion. In so far as influenced by income, however, the computation necessarily must be made on the basis of reasonable charges, for whatever is exacted for a public service in excess of this is to be regarded as unlawful. Save as above indicated, the element of value designated a 'going concern' is but another name for 'good will', which is not to be taken into account in a case like this, where the company is granted a monopoly." (*Cedar Rapids Gaslight Co.* v. *Cedar Rapids,* 144 Iowa, 426, 120 N. W. 966.) This holding is approved by the Supreme Court of the United States in considering the same case, reported in 223 U. S. 655, 32 Sup. Ct. 389.

"There can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use. It involves a practical contradiction of terms to say that property useful and actually used in a public

service is not to be estimated as having the value of property in use but is to be reckoned with on the basis of its 'junk value.' " *Denver* v. *Denver Union Water Co. supra.*

"It is apparent that a substantial sum was allowed for going value. This allowance necessarily presupposed and took into consideration the fact that the property was in a position to earn a fair return on the reasonable value of it. A plant that has been in existence as long as this one that was incapable of paying dividends, might, of course, have a going value, but it would be very small. Such a property would hardly be salable at the bare cost of reproduction, less depreciation. * * * The value of the plant and business is an indivisible gross amount, and * * * it is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all, not as separate things but as inseparable parts of one harmonious entity, and exercising the judgment as to the value of that entity." *Duluth Street Railway Co.* v. *Railroad Com. supra.*

Exchange value should not be considered by the commission in establishing the proper valuation as a basis for rate-making purposes. The exchange value is, in the case of a property whose function is simply to earn money, determined primarily by the earning power, and the more unjust and unreasonable the charge made by the utility the higher the exchange value. In rate cases the question in determining the value is not how much has been or can be got out of the property, but how much has been put into it, in order that from that fact it may be determined how much may be reasonably taken out of it in the way of net income. Exchange value is therefore measured by return. The Supreme Court of the United States said in the Minnesota rate cases: "The value of the use, as measured by return, cannot be made the criterion when the return itself is in question. If the return, as formerly

allowed, be taken as the basis, then the validity of the State's reduction would have to be tested by the very rates which the State denounced as exorbitant, and if the return as permitted under the new rates be taken, then the State's action itself reduces the amount of value upon which the fairness of the return is to be computed." *Simpson* v. *Shepard, supra.*

It is also contended by appellee that the cost of supplying gas to the small consumer is greatly in excess of the amount allowed in the schedule established by the commission, and that the burden of paying the return on the capital invested is placed on one-third of the output of gas, —that is, the third taken by the large consumers. The point here in question was passed upon by the Supreme Court of the United States in *Willcox* v. *Consolidated Gas Co. supra,* where objection was made on behalf of the company to the reduced rate fixed for gas supplied to the city. It was there said: "Lastly, it is objected that there is an illegal discrimination as between the city and the consumers individually. We see no discrimination which is illegal or for which good reasons could not be given. But neither the city nor the consumers are finding any fault with it, and the only interest of the complainant in the question is to find out whether by the reduced price to the city the complainant is, upon the whole, unable to realize a return sufficient to comply with what it has the right to demand. What we have already said applies to the facts now in question. We cannot see, from the whole evidence, that the price fixed for gas supplied to the city by wholesale, so to speak, would so reduce the profits from the total of the gas supplied as to thereby render such total profits insufficient as a return upon the property used by the complainant. So long as the total is enough to furnish such return, it is not important that, with relation to some customers, the price is not enough." Similar contentions were made in *Puget Sound Traction, Light and Power Co.* v. *Reynolds, 244*

U. S. 574, 37 Sup. Ct. 705.   The company there contended
that because two lines of the street railway forming a part
of its railway system did not pay even operating expenses
under a five-cent fare, the order of the Public Service Com-
mission of the State of Washington establishing a five-cent
fare for the system as a whole was illegal.   The Supreme
Court collects and discusses authorities on the point, and
holds that if the net earnings of the whole system are suffi-
cient to produce a reasonable return to the utility, the courts
will not concern themselves with the details of rates estab-
lished by the rate-making authorities.   To the same effect
is the holding of this court in *People* v. *St. Louis, Alton
and Terre Haute Railroad Co.* 176 Ill. 512, and *Chicago
Union Traction Co.* v. *City of Chicago, supra.*

We have hereinbefore expressed our views on the gen-
eral subject of valuation of a public utility for rate-making
purposes and will now apply those views to the special facts
in the case at bar.

The original operating utility, the Springfield Gaslight
Company, was granted a charter by the legislature in 1854.
A price of $3.25 a thousand cubic feet of gas a month was
maintained until 1878, when the price was reduced to $2.
In 1884 this price was reduced to $1.50 and so remained
for ten years, when it was reduced to $1.20, and one year
later to $1, at which point it remained until this hearing.
The company was organized with a capital stock of $75,000
and so remained until 1903, when it was purchased by the
parties now interested in it for over $500,000.   At this
time the stock was doubled, making the outstanding stock
total $150,000 par value, and in addition $150,000 of five
per cent first mortgage bonds, due in 1953, were issued.
In 1908 the capital stock was further increased to $275,000.
In 1913 the name was changed to the Springfield Gas
and Electric Company and the local electric utility was ab-
sorbed, the capital of the consolidated utilities being fixed
at $3,000,000.   Five experts who appeared as witnesses

placed the following valuations upon the property: Adams, for the city, $547,448.14; Bemis, for the city, $588,262; Little, for the commission, $806,404; Anderson, for the company, $898,785; Brown, for the company, $940,988. The finding of the commission was: "After considering all the evidence and testimony in this case bearing upon the value of the property herein, the cost-to-reproduce, the original costs, the investment, the present value, all overheads, including such as preliminary costs, engineering, supervision, interest, insurance, organization and legal expenses during construction, contingencies, and all other elements of value, (tangible and intangible,) and taking into consideration that the plant is now in successful operation and a going concern, the commission finds the fair value of the respondent's gas property in Springfield, for the purpose of determining reasonable and just rates, to be $744,000, exclusive of working capital. (Working capital is here used to mean necessary cash, coal, materials, supplies, etc., essential to the successful operation of the gas utility.) For working capital, thus defined, the commission hereinabove has set forth $56,000 to be reasonable and adequate in the premises. The total valuation, for the purpose of establishing just and reasonable gas rates in Springfield, therefore, is in amount $800,000." Notwithstanding this statement of the commission, we are convinced from an examination of the record that it did not give due consideration to that element of value known as "going value." Our conclusion in this regard is given support by the declaration in the opinion of the commission that "this commission holds that going value, in its commonly accepted meaning, either may or may not exist in a given utility property." We cannot agree with this statement in view of the authorities hereinbefore cited and discussed. This element of value is always present in every assembled and established plant doing business and earning money. It is a property right and must be considered by the commission in determining the value

of the property upon which the utility has a right to make a fair return. The engineer for the commission and the engineers for the company all state that the valuation fixed by them did not include an allowance for "going value." As we have said, this element of value is one that cannot be fixed with mathematical accuracy, and while it is not necessary that the finding of the commission fix a separate value for it, it is necessary that the finding show that due consideration was given to this part of the property of the utility. The evidence in this record is undisputed that there was an element of value over and above the valuations fixed by the engineers which was not considered by the commission in fixing the value of appellant's property. The whole value found by the commission is over $6000 less than the depreciated original cost of labor and material in the property as testified to by the engineer for the commission, and more than $100,000 less than that testified to by the engineers for the company. It is obvious, therefore, that the commission has made no allowance for going value, because its own engineer, as well as those for the company, testified that their estimates included nothing for going value. The total value for rate-making purposes as fixed by the commission is therefore against the manifest weight of the evidence, because it does not include this element of value which the uncontradicted evidence shows to exist.

It is contended by appellee that the commission did not include in its valuation a million-foot gas holder erected by the company in 1913. On a down-town property appellee has three holders, of 200,000, 85,000 and 60,000 cubic feet capacity, respectively. The maximum daily send-out of gas was shown to be 835,500 cubic feet. It was therefore necessary for the company to have more holder capacity, and to provide this it leased a tract of land on the outskirts of the city and erected a holder of a million cubic feet capacity. This was, of course, more than the present needs of the company required, but in the view of its engineers

the construction of a holder of that capacity was economical and advisable. Extensive as the powers granted to the commission are, they do not take away from the corporation its power of control upon a question of financial policy. The discretion of a utility commission cannot override the discretion of the officers of the corporation in the management of its affairs. (*Havre de Grace and Perryville Bridge Co.* v. *Towers, supra.*) On the other hand, it is not just to compel consumers to pay for more than they receive or to pay appellee an income on property which is not actually being used in furnishing gas. (*San Diego Land and Town Co.* v. *Jasper, supra; Stanislaus County* v. *San Joaquin and King's River Canal and Irrigation Co. supra.*) The commission found that a portion of the capacity of this million-foot gas holder necessarily would be used and useful for gas-making purposes in Springfield at the date of the valuation, and that a greater proportion of the capacity will be required by the consumers from year to year until the full capacity is finally utilized. It found that the capacity of the holder was not unduly large in view of appellant's probably justifiable faith in the near future growth of gas sales in Springfield to reach a send-out which would utilize the ultimate holder capacity. The evidence shows the value of this holder with its auxiliary mains and accessories to be approximately $100,000. Because of the fact that the whole capacity of the holder was not in use at the time of the appraisal the commission found that "for rate-making purposes obviously only a proper proportion of the cost of the gas holder (and accessories) is to be taken into consideration in reaching a reasonable conclusion as to an equitable total valuation of the gas property in Springfield;" but the commission does not state what portion of the value is equitable or what it allowed on this item of property towards the total valuation of the gas property of appellant. It is not necessary that every article of property be separately valued, but where it appears from the find-

ing of the commission that only a certain proportion of the actual value of the whole, or any considerable part of the property of the utility, is to be taken into consideration, then such value must be stated by the commission, or the proportion considered must be stated; otherwise, this court will be helpless in an effort to review the reasonableness of the commission's findings and order. It is impossible from the state of this record to determine whether or not a just proportion of the value of this holder was allowed in determining the total value of all the gas property of this utility.

The commission fixed as a fair rate of return upon a fair value of appellee's used and useful gas property in Springfield seven per cent per annum. It is not seriously contended that this is not a reasonable rate of return, and we think the authorities support the finding. What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense. (*Duluth Street Railway Co.* v. *Railroad Com. supra.*) Ordinarily the utility is entitled to a rate of return not less than the legal rate of interest. (*Brymer* v. *Butler Water Co. supra.*) There is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality. Among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them. We do not think the action of the commission in fixing this rate was arbitrary or unreasonable. This conclusion finds support in *Willcox* v. *Consolidated Gas Co. supra.*

One of the elements to be considered by the commission in determining what was a reasonable rate to be charged by this utility was the operating expenses. From the evidence produced by appellee's auditor it appears that the

average operating expenses for the last eight years have been slightly over fifty-four cents a thousand cubic feet of gas sold. The commission found that this expense could be reduced by producing a greater per cent of coal gas and a less per cent of water gas; by reducing the expenses in the sales department; by a more equitable division of general office expense between the gas department, the electric department, the railway department and the steam heating department, and by earnings from non-operating revenue, which include profits on fixtures, piping, etc., sold to its customers. It also found that the average operating expense in the cities of Peoria, Waukegan, Rockford, Rock Island, Decatur, Quincy and Freeport,—cities similarly situated,—was about forty-seven cents a thousand cubic feet. While this was not controlling, it was proper to be considered by the commission. After considering all these and other elements the commission determined that fifty cents a thousand cubic feet of gas sold in Springfield was reasonably ample to cover total operating expenses. While the commission's finding is not supported by a clear preponderance of the evidence, yet it cannot be said that its finding on this item is against the manifest weight of the evidence. It must, however, be kept in mind in considering questions of business policy that the commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.

Ultimately in every case of this character the question to be determined is: What is a fair and reasonable return upon the present value of the property employed in rendering the service to the public? The findings of the Public Utilities Commission may be reviewed by the courts to determine, among other things, whether its decision is against the manifest weight of the evidence. In order to enable

the courts to intelligently review its decision the commission should make its findings specific enough to enable the court to determine upon what basis it made its valuation and what elements of value entered into it, with a specific and separate valuation of such elements. As we have said, it is not necessary for the commission in its findings to separately value the articles of property considered by it, but it should state its ultimate conclusions as to each of the elements necessary to be considered. For instance, as hereinbefore pointed out, the commission declares in its conclusion that in determining the present value of appellee's property it took into consideration "the cost to reproduce, the original costs, the investment, the present value, all overheads," and other elements of value enumerated. In order to consider these elements it was necessary to determine their several values. Before the commission could consider the cost to reproduce it must determine what it would cost to reproduce the property, and the value so determined should have been stated in the findings of the commission. So, also, should the commission have stated in its findings the original cost and all other elements declared by the commission to have been considered by it. This requirement will work no hardship on the commission, because if it considered these elements it must necessarily have first found their respective values, and there is no sound reason why the ultimate conclusions of the commission on the elements considered by it in determining the present value should not be set out in its findings. In order to readily see and understand the elements of value considered by the commission and the consideration given these elements in reaching its final decision it is necessary that the findings of the commission disclose the specific valuations of the elements considered. The courts will then be able to determine whether a just and fair valuation has been made and a fair and reasonable rate has been established. The Public Utilities act declares that "at the conclusion of such

hearing the commission shall make and render findings concerning the subject matter and facts inquired into, and enter its order based thereon." The facts inquired into necessarily include the elements of value considered in determining the present value, and unless the commission makes and renders findings on these ultimate facts the courts will be helpless in their effort to determine whether the order is based on such findings. If the final order of the commission is not against the manifest weight of the evidence the order will not be set aside merely on the ground that one or more of the items of value may be regarded as too high or too low. The court will not review the findings of the commission on the separate elements of value considered by it but will limit its review to the final result. The commission declares in its opinion in this case that the valuation fixed was determined by considering, among other elements, the original cost and the cost to reproduce. A fair consideration of the record shows that no element was considered except the original cost of construction, less depreciation. In this the commission was in error. A fair present value of a public utility cannot be determined without full and proper consideration being given to the cost to reproduce new. As was said by the Supreme Court of the United States in *Lincoln Gas and Electric Light Co.* v. *City of Lincoln,* 250 U. S. 256, 39 Sup. Ct. 454: "It is a matter of common knowledge that, owing principally to the world war, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted and largely since this cause was last heard in the court·below; and it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future." The commission must, in its final decision in all such cases, determine (1) the present value of the property for rate-making purposes; (2) the rate

of return to which the utility is entitled; and (3) the fair and reasonable rate to be charged for the service. For this error and other errors hereinbefore pointed out this cause must be remanded to the commission, and the commission will on further consideration make specific and separate findings of its ultimate conclusions as to each element of value considered.

After all, the questions presented in this case are largely questions of business judgment, and no rule can be laid down which can be applied mathematically to every situation. Each case must rest largely upon its own facts. We are aware of the grave character of the questions with which we have had to deal and of the great injury, not only to private interests but to the public at large, that may result from error. The same may be said of any legislative policy in matters of moment. We have dealt with the legal principles underlying this case, but the ultimate question is a question of business and results cannot be predicted. In such a case the commissioners ought to move with caution. An unwise administration of regulatory laws will drive capital from this field and bring on public calamity by causing the utilities to cease to function. It is equally important to the public and the utility that the rates established be just and reasonable.

For the reason that the commission wholly excluded from its consideration that element of value known as going value, and for the reason that the commission has not indicated what portion of the value of the million-foot gas holder was considered by it in reaching the value of the gas property of the appellant, the circuit court properly set aside its decision. But the circuit court erred in not remanding the cause for further proceedings. The judgment of the circuit court of Sangamon county is therefore modified by remanding the cause to the Public Utilities Commission for further proceedings in accordance with the views herein before expressed, and the judgment so modified is affirmed.

*Judgment modified and affirmed.*