(No. 74760.—<span style="background:black"></span>)

## UNITED CITIES GAS COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.

*Opinion filed September 22, 1994.—Rehearing denied December 5, 1994.*

2

Daniel J. Kucera and Christopher J. Townsend, of Chapman & Cutler, of Chicago, for appellant.

Carmen L. Fosco, Special Assistant Attorney General, of Chicago, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

This appeal arises from an order entered by the Illinois Commerce Commission (Commission) in a proceeding to reconcile the revenues collected by United Cities Gas Company (United Cities) in 1988 with the actual costs of gas purchased for that year. Following a hearing, the Commission ordered United Cities to refund with interest $260,553 of gas costs allocated to certain of its Illinois customers in 1988. The appellate court

affirmed the order of the Commission, with one justice dissenting. 235 Ill. App. 3d 577.

Background

The Commission has authorized public gas utilities to recover the costs of gas purchases through the Commission's uniform purchased gas adjustment (PGA) clause, promulgated in 83 Ill. Adm. Code § 525 (1982). The Commission's power to authorize such recovery is derived from section 9—220 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220). Section 9—220 provides in pertinent part:

> "Notwithstanding the provisions of Section 9—201 [regarding changes in rates], the Commission may authorize the increase or decrease of rates and charges based upon changes in the cost of *** purchased gas through the application of *** purchased gas adjustment clauses. *** Cost shall be based upon uniformly applied accounting principles. Annually, the Commission shall initiate public hearings to determine whether the clauses reflect actual costs of *** gas *** purchased to determine whether such purchases were prudent, and to reconcile any amounts collected with the actual costs of *** gas prudently purchased. In each such proceeding, the burden of proof shall be upon the utility to establish the prudency of its cost of *** gas purchases and costs." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220.)

Expenses other than gas purchase costs are recovered in base rates, which are set in periodic rate hearings or cases. (See Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 9—101 through 9—212.) Under the PGA clause, a gas utility's gas costs are first estimated and then incorporated into a formula which results in a gas cost rate. This rate, together with the base rate, combine to determine a customer's monthly gas bill.

As set forth in section 9—220 of the Act, gas utilities are required to reconcile the revenues they received in the previous year through the gas cost rate with the actual costs of gas prudently purchased for that year.

Because the gas cost rate is based on estimates, and because actual gas prices can change during the year, either an undercollection or an overcollection of gas cost revenues may occur. After reconciling the revenues collected through the gas cost rate with the actual costs incurred, the utility collects any underrecovery from its customers or refunds any overrecovery to its customers. This is accomplished by adjustments to a factor (R4) in a mathematical refund adjustment formula of the PGA clause. Pursuant to section 9—220, the Commission conducts annual proceedings to determine the propriety of the utility's reconciliations of its gas cost rate revenues with actual costs incurred. This reconciliation procedure is also known as a "true-up."

In September 1989, the Commission initiated a reconciliation proceeding and directed United Cities to present evidence confirming its reconciliation of PGA revenues with the actual cost of gas prudently purchased for the calendar year 1988. Evidence adduced at the hearing included the following.

United Cities is an investor-owned retail gas distribution utility which provides natural gas service in five areas of Illinois and, as such, is regulated by the Commission. United Cities is also subject to the regulatory jurisdiction of seven other States in which it provides natural gas service. The service areas relevant to this appeal are Harrisburg, Illinois, and the cities of Franklin and Murfreesboro, Tennessee.

Texas Eastern Transmission Corporation (Texas Eastern) is United Cities' pipeline supplier for both the Harrisburg and Tennessee service areas. The rates charged by pipeline suppliers are subject to regulation by the Federal Energy Regulatory Commission (FERC) and all contracts between gas utilities and pipeline suppliers must be approved by FERC.

The long-term contract between United Cities and

Texas Eastern contains a demand/commodity rate schedule under which United Cities is required to pay both a commodity charge, based upon metered volume usage, and a demand charge. The demand charge, which is the charge at issue, consists of two different fees: a contract demand charge and a storage demand charge. In exchange for the contract demand charge, Texas Eastern guaranteed that it would have available gas and the pipeline capacity to deliver that gas up to the contracted maximum daily quantity. In exchange for the storage demand charge, Texas Eastern guaranteed that it would have field or tank storage capacity and actual gas up to the contracted daily maximum quantity. These charges assure that a specified amount of gas is available for use by United Cities' customers. Both charges are fixed amounts that United Cities is required to pay, irrespective of whether it uses the contracted maximum quantity of gas. For purposes of this appeal, we refer to both fees in the singular as the demand charge.

The Texas Eastern demand charge was arrived at by projecting the anticipated maximum daily demand for gas in each of the service areas covered by the contract and then multiplying that figure by the demand rate. United Cities then made its own internal apportionment of the total amount of the demand charge to the customers in the areas served by the Texas Eastern contract proportionate to the estimated maximum peak day demand for gas in each service area. In 1988 United Cities allocated 42% of the total demand charge to the Harrisburg area and 58% to the Tennessee area. The origin of these percentages was a 1984 study of the projected peak day demand requirements for the Harrisburg and Tennessee service areas following United Cities' acquisition of the Franklin, Tennessee, service area. The study was performed for and submitted

in a 1984 rate case before the Tennessee Public Service Commission (Tennessee Commission). These same allocation percentages were submitted in a rate filing before the Tennessee Commission in 1986, which was concluded in February 1987. United Cities continued to use these 1984 percentages to establish customer rates for Harrisburg from 1985 through almost all of 1989. In December 1989, in a hearing before the Tennessee Commission, United Cities revised its allocation percentages, lowering Harrisburg's percentage to approximately 28% of the total Texas Eastern demand charge.

Bobby J. Cline, a rate analyst and the sole witness for United Cities, presented United Cities' reconciliation of the revenues billed under the PGA clause with the actual gas costs incurred in 1988. Those computations showed a total underrecovery in the five Illinois service areas of $171,170.88. The amount of the underrecovery attributed to Harrisburg for 1988 was $72,090.57. This amount was reflected in the R4 factor of the PGA clause filed in 1989 and was collected through the monthly billings of Harrisburg customers from April 1, 1989, to March 31, 1990.

John Link, an accountant for the Commission's public utilities division, testified on behalf of the Commission's staff (Staff). Link agreed with the reconciliations submitted by United Cities for each of the Illinois service areas except Harrisburg. Link testified that Harrisburg's actual percentage of peak day demand in 1988 was only 28.69% as compared to the 42% projected and billed by United Cities. Link maintained that an adjustment was necessary because the allocation percentages used by United Cities in its internal apportionment of demand costs between the Harrisburg and Tennessee service areas were outdated and inaccurate. The use of these allocation percentages would have the effect of charging Illinois customers a disproportion-

ate share of the Texas Eastern demand charge and would result in Harrisburg customers' subsidizing United Cities' Tennessee operation for a portion of the demand charge rightfully chargeable to Tennessee customers. Illinois has a fully-tracking, zero-based uniform PGA clause which allows a gas utility to recover its gas costs no more or less than dollar-for-dollar. Accordingly, Link recommended that United Cities be required to refund to its Harrisburg customers $260,553 plus interest through the R4 factor so as to reconcile the difference between the actual Harrisburg demand and the percentage of demand charges allocated to Harrisburg by United Cities.

Link presented data obtained from United Cities which showed a substantial increase in Tennessee and a corresponding decrease in Harrisburg of customers and sales from 1985 through 1989. Link opined that the increase in Tennessee sales would have yielded sufficient additional revenues to have resulted in United Cities already having recovered from its Tennessee customers the total amount of actual costs incurred for gas purchased in 1988. However, Link testified, irrespective of what amount was recovered from Tennessee, Illinois customers should pay no more or less than gas costs prudently purchased for and properly chargeable to them.

Cline testified that unlike Illinois, Tennessee does not have a PGA cost recovery system whereby there is a reconciliation or "true-up" of gas costs and revenues. Rather, the majority of gas costs are included in the base rate. Thus, there can be no change in the Tennessee demand allocation except in a future general rate case before the Tennessee Commission. United Cities did not review the demand allocation percentages for 1988 because the company had just completed a 1986 rate case in Tennessee in 1987. Cline stated that "to get a

demand allocation factor for the coming calendar year, you have to go in and prepare that" and "someone" at United Cities "[e]vidently *** did not see a need to revise the allocation factors." Moreover, United Cities did not file a 1987 or 1988 rate case in Tennessee. These were the reasons that the allocation set in the 1984 Tennessee rate case was not revised until the 1989 Tennessee rate filing.

Cline took the position that Staff's proposal to adjust demand charges based on historical data for the year was objectionable because demand charges are "forward-looking" by reason of the long-term Texas Eastern contract, and because the actual peak day demand could not be determined until approximately mid-January of the following year. Cline also disputed Link's allegation that an increase in sales necessarily results in an increase in operating revenues, such that United Cities would fully recover or overrecover its total demand charges from Tennessee customers. He asserted that if United Cities had recovered all of its costs through increased revenues, it would not have had to go before the Tennessee Commission for rate increases in 1986 and 1989.

Cline analogized the demand charge to an insurance premium from which the insured benefits by having the security of the insurance whether or not he collects it. Likewise, Cline opined, the Harrisburg customers benefitted from the security that a certain level (42%) of contract demand, *i.e.*, capacity, was reserved for them. Thus, despite that the amount of the projected peak day demand may not have been consumed, Harrisburg customers received the full benefit of the 42% of the Texas Eastern demand charge. Cline acknowledged, however, that the allocation was an internal, company-generated figure, and that if one area needed more than its allocated amount of gas and another required less

gas, the company could distribute the gas as it was needed at will, rather than as the allocation percentages designated.

The Commission issued its order on October 4, 1991. An amendatory order merely correcting a term misusage was filed on October 17, 1991. The order contained the Commission's findings of fact and conclusions. The Commission determined that the evidence did not establish that there had been an overrecovery of the total demand charge as a result of increased sales in Tennessee. However, the Commission distinguished the lack of evidence of an overrecovery from Tennessee customers from what it determined was an overcollection by United Cities of the demand charge from its Harrisburg customers. The Commission noted that data presented showed a clear shift in sales and customers from Illinois to Tennessee, a steady increase in peak day demand in Tennessee, and a corresponding decrease in peak day demand in Harrisburg from 1985 to 1989. The Commission found that this evidence constituted a change in circumstances that justified rejection of United Cities' allocation of 42% of the total demand charges to the Harrisburg service area. The Commission also found that United Cities' failure to review the allocation percentages in the 1986 Tennessee rate case demonstrated an indifference toward its Harrisburg customers, and that this indifference coupled with the shift in actual sales and customers justified a departure from the Commission's past approval of United Cities' allocations. In conclusion, the Commission agreed with and adopted Staff's recommended adjustment in this case. The Commission's order stated, in part:

"(4) the evidence indicates that Respondent [United Cities] acted reasonably and prudently in its purchases of natural gas during calendar year 1988;

(5) for calendar year 1988, Respondent's reconciliation evidence indicates that it experienced an undercollection

of gas costs in the amount of $171,170.88; this amount was reflected in Respondent's R4 factor filed in 1989; Staff's proposed adjustment, which reflects a decrease in gas cost in the Harrisburg service area due to a revision in the Texas Eastern demand charge allocation factor, is reasonable and should be approved; Staff's proposed adjustment is necessary to prevent Respondent's customers in the Harrisburg service area from being billed for PGA revenues in excess of the cost of gas prudently purchased; Respondent should refund its overcollection of Texas Eastern demand charges in the amount of $260,553 plus interest to its customers in the Harrisburg service area through the R4 factor of the PGA in accordance with the provisions of 83 Ill. Adm. Code 525.60;

(6) Respondent should review the Texas Eastern demand charge allocation factors at the time of each Tennessee rate case; Respondent should submit its study of such allocation factors to the Accounting Department of the Commission's Public Utilities Division at the same time that it is submitted for review in Tennessee."

United Cities appeals from the order of the Commission and the decision of the appellate court affirming that order on eight general grounds. For the reasons that follow, we affirm the appellate court.

Scope of Review

The Commission is the administrative agency responsible for setting the rates utilities charge their customers. It is governed by the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/3, par. 1—101 et seq.), in which the legislature has enunciated the Commission's powers and duties. The Commission is the fact-finding body in the ratemaking process. On appeal from an order of the Commission, its findings of fact are to be considered prima facie true; its orders are considered prima facie reasonable; and the burden of proof on all issues raised in an appeal is on the appellant. Ill. Rev. Stat. 1989, ch. 111²/3, par. 10—201(d); People ex rel. Hartigan v. Illinois Commerce Comm'n (1989), 148 Ill. 2d 348, 366-67.

An order of the Commission will be reversed only if it is outside the jurisdiction of the Commission or is not supported by substantial evidence, or if the proceedings or manner in which the order was arrived at violated the State or Federal Constitution or relevant laws, to the prejudice of the appellant. (Ill. Rev. Stat. 1989, ch. 111$^2$/$_3$, pars. 10—201(e)(IV)(A) through (e)(IV)(D); *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.* (1919), 291 Ill. 209.) It is well settled that a decision of the Commission is entitled to great deference because it is the "judgment of a tribunal appointed by law and informed by experience" (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523). Apart from examining whether the Commission acted outside the scope of its constitutional or statutory authority, a reviewing court is limited to determining whether the findings of the Commission are against the manifest weight of the evidence. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1992), 148 Ill. 2d 348, 367; *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204.) The Commission's interpretation of a question of law, of course, is not binding upon a reviewing court. Upon review of a Commission order, the court may, in whole or in part, reverse and set aside the order, affirm the order, or remand the cause to the Commission for further proceedings. *People ex rel. Hartigan*, 148 Ill. 2d at 367.

## Analysis

United Cities contends that the Commission's order violates the prohibition against retroactive ratemaking discussed in *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195. United Cities argues that the order constitutes a new ratemaking rule which departs from the Commission's policy, upon which United Cities relied, of allowing demand charges to be based upon projections rather than actual demand.

*Citizens Utilities Co.* was a rate case for the year 1983, involving the treatment of expenses relating to a contract plant. A contract plant is a facility that was constructed by a real estate developer and later deeded to the utility. Generally, the utility pays the developer a regular fee based upon rates charged to the utility's customers. However, because the utility acquires the plant at no cost to itself, a contract plant is not included in the company's rate base for ratemaking purposes. In computing its Federal income taxes, Citizens had depreciated the contract plant, and thus reduced its income tax liability. Citizens did not, however, similarly depreciate the contract plant in computing its income tax expense for ratemaking purposes. Thus, it showed a greater income tax expense for ratemaking purposes than it actually paid the Federal government. The higher figure had been used in establishing Citizens' rates for the years 1958 through 1982.

The Commission concluded that Citizens had compiled approximately $4.6 million in tax benefits as of the end of 1983. The Commission ordered that $400,000 in tax depreciation expense for the test year 1983 be deducted from Citizens' taxable income, which reduced its income tax expense for ratemaking purposes. The Commission further ordered that the remaining $4.2 million be deducted from Citizens' rate base. On appeal, this court determined that the $4.2 million base rate reduction constituted retroactive ratemaking. The court stated:

> "We believe that the real effect, whether intended or not, of the $4.2 million reduction in Citizens' rate base is to deny retroactively the tax benefits the Commission permitted the company to enjoy during the period from 1958 to 1982. Such action clearly conflicts with fundamental principles of ratemaking in Illinois. The prohibition of retroactive ratemaking is derived from the overall scheme of the Act and the role of the Commission in the ratemak-

ing process. [Citation.] The Act authorizes reparations only for what are deemed 'excessive' charges. [Citation.] A rate is effective once it is established by the Commission, unless the rate order is stayed pending review. [Citation.] Moreover, a public utility is required to charge the rates determined by the Commission, in its legislative capacity [citation], and penalties may be imposed if the company fails to charge the established rates [citation]. The rule prohibiting retroactive ratemaking is consistent with the prospective nature of legislative activity, such as that performed by the Commission in setting rates. Moreover, because the rule prohibits refunds when rates are too high and surcharges when rates are too low, it serves to introduce stability into the ratemaking process. [Citation.]" (*Citizens Utilities Co.*, 124 Ill. 2d at 206-07.)

The court held that the $4.2 million of tax benefits between 1958 and 1982 originated as expenses that the Commission allowed Citizens to recover, and that there could be no retroactive adjustment in the case simply because the Commission subsequently decided to treat the tax benefits differently. The court noted that the Commission was attempting to correct what it perceived to be errors in past rate orders, despite the absence of any suggestion that Citizens had obscured any information or otherwise misled the Commission in making those determinations.

At the same time, however, the court upheld the Commission's reduction of the $400,000 tax depreciation expense for the test year 1983 for ratemaking purposes. The court reasoned that this tax expense was never included as part of Citizens' rate base and, therefore, the reduction did not remove an item that the Commission had at one time incorrectly installed as part of Citizens' rate base. (*Citizens Utilities Co.*, 124 Ill. 2d at 204.) *Citizens Utilities Co.* does not support United Cities' argument in the case at bar.

Foremost, unlike *Citizens Utilities Co.*, the case at bar is not a traditional rate case in which the Commis-

sion establishes the base rates a utility may charge its customers. This case involves a reconciliation proceeding under section 9—220 of the Act. As quoted earlier, section 9—220 begins with the phrase "[n]otwithstanding the provisions of [this Article]," and continues, "the Commission may authorize the increase or decrease of rates and charges based upon changes \*\*\* in the cost of purchased gas through the application of \*\*\* purchased gas adjustment clauses." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220.) Section 9—220 directs the Commission to annually initiate hearings to determine the actual costs of gas purchased and whether such purchases were prudent, and to then reconcile any amounts collected with the actual costs of gas prudently purchased. The burden of proving the prudency of its gas purchases is on the utility. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220.) It is clear from the language and substance of section 9—220 that it is an exception to the general prohibition against retroactive adjustments of rates. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948.

Further, in this case the Commission did not disturb any of its prior orders or disallow charges or benefits it had previously approved, as did the Commission in *Citizens Utilities* when it ordered a deduction from the base rate of tax benefits it had allowed for 24 prior years. The Commission merely determined that United Cities had failed to sustain its burden of reconciling its revenues with the actual costs of gas prudently purchased for Harrisburg in the year for which the reconciliation was performed. The court therefore disallowed the claimed underrecovery and also ordered a refund of costs found to have been improperly charged to the Harrisburg service area for 1988. Notwithstanding that in previous years the Commission had approved United Cities' reconciliations of PGA costs and revenues based

upon a 42% allocation to Harrisburg of demand charges, actual costs and revenues collected are to be reconciled annually. Indeed, United Cities' argument that the Commission had previously "approved" its demand allocation in previous years indicates an acknowledgment that a utility's reconciliation figures are subject to annual scrutiny and approval. Parenthetically, with regard to the 1986 and 1987 reconciliations, we note that Staff witness Link testified that he had not been aware in those prior proceedings that the allocation of demand charges was an estimated calculation; and that based upon data developed in the course of this proceeding, which showed a consistent decrease in sales, customers and peak day demand in Harrisburg since 1985, it was his hindsight opinion that those prior reconciliations should not have been approved. We reiterate, however, that the Commission's order in the present proceeding did not make adjustments to or rescind the orders entered in those proceedings so as to retroactively deny United Cities revenues or benefits which had been previously allowed.

It should also be noted that section 9—220 may work to the benefit of a utility, since it authorizes the Commission to order an increase in rates due to an undercollection of prudent gas costs. Notably, in the reconciliation proceeding at issue, United Cities claimed a total underrecovery of $171,170.88 of costs in its five Illinois service areas, which amount was reflected in and collected through its R4 factor filed in 1989. Pursuant to its authority under section 9—220, the Commission did, in fact, approve United Cities' reconciliation figures for the four service areas of Illinois other than Harrisburg, thus allowing United Cities an increase in its charges for the year 1988 in those areas.

The appellate court in *Business & Professional People for the Public Interest v. Illinois Commerce*

*Comm'n* (1988), 171 Ill. App. 3d 948, considered matters similar to those before us. The court first held that the Commission was authorized to inquire into the production management of an nuclear power plant in determining whether fuel purchases were prudently made. The court affirmed the Commission's order of a $70 million refund of charges collected under the uniform fuel adjustment clause (UFAC), which is the equivalent of the PGA in the electricity industry, on the ground that the plant operated at only 17.7% capacity during the year at issue rather than at the 60% capacity projected by the utility. The court recognized that the amounts collected under the UFAC reflected the utility's actual costs. It observed, however, that $70 million of those costs were incurred because the plant did not operate at its forecasted capacity. The customers were paying greatly increased rates based upon the plant's being in full operation and, at the same time, paying for fuels to replace the power not being generated by the minimally operating plant. The court stated, "[i]f, in a fuel reconciliation proceeding, the Commission could not examine the reasons that necessitated a fuel purchase, the prudence standard would have no effect on ensuring a just and reasonable rate" as is required by the Act. *Business & Professional People,* 171 Ill. App. 3d at 958.

The court in *Business & Professional People* held that the ordered refund did not violate the rule against retroactive ratemaking prohibiting an increase or decrease of a rate which had been determined to be just and reasonable and had been put into effect. The court noted that the reasonableness of a charge under the UFAC could not be determined until after it was collected, and that section 36, now section 9—220, was an express legislative exception to the prohibition against retroactive ratemaking. The court thus determined that the Commission acted within its statutory

authorization when it applied the prudency standard not only to the actual purchase amounts but to the reasons for those purchases in determining that, based upon what the utility knew or should have known, it was unreasonable to have forecasted that the plant would have a 60% operating ability. We agree with the reasoning and holdings in *Business & Professional People*.

In the instant case, as in *Business & Professional People*, Staff did not dispute that the Texas Eastern demand charge was a gas cost which United Cities had actually incurred. Neither did Staff dispute that United Cities acted reasonably and prudently in contracting with Texas Eastern to pay the demand charge. Rather, Staff argued, and the Commission agreed, that United Cities did not act reasonably in allocating 42% of the total demand charge to its Harrisburg customers on the basis of projections and data which it knew or should have known were outdated and inaccurate. Since data established that Harrisburg did not require 42% of the total volume of gas reserved under the Texas Eastern contract, United Cities' own "reservation" of 42% of that gas for Harrisburg was not prudent and, hence, the 42% allocation of the total demand charge to Harrisburg customers was not a cost of gas prudently purchased. Section 9—220 expressly authorizes the Commission to determine the prudency of purchases of gas before reconciling the revenues collected with the actual costs of gas prudently purchased. The disallowance of imprudent gas costs under section 9—220 does not constitute retroactive ratemaking.

United Cities also contends that the Commission violated the prohibition against retroactive ratemaking by abandoning what United Cities refers to as its "multi-jurisdictional consistency rule." United Cities argues that an important feature of the instant cause is that it

involves two different jurisdictions, each of which has a different rule for recovery of gas costs by a gas utility, and a common gas cost which must be allocated to the customers in each State. United Cities further argues that this court has repeatedly held that a utility is entitled to recover 100% of every cost of service, and that to assure that objective, the Commission has established a "multi-jurisdictional consistency ratemaking rule" which requires it to approve an allocation method that will ensure consistency among jurisdictions so as to avoid the overcollection or undercollection of total gas costs. United Cities cites *Illinois Commerce Comm'n v. Iowa-Illinois Gas & Electric Co.* (1989), 105 Pub. Util. Rep. 4th 353, the Commission's decision in what is referred to by the parties as the "Barnsley Order" (*In re United Cities Gas Co.* (November 19, 1990), ____ Ill. Commerce Comm'n Rep. ____ (ICC Nos. 90—0008, 90—0152 cons.)), and the Commission's prior PGA reconciliation approvals as recognition and application by the Commission of the "multi-jurisdictional consistency rule."

Initially, we note that with regard to this issue and throughout its brief, United Cities asserts that "[*i*]*t is undisputed* that 42% of legitimate demand costs were incurred by United Cities in 1988 in *reserving* 42% of pipeline capacity for Illinois customers. *It is also undisputed* that this 42% reservation of capacity, which cost 42% of the total demand cost, was prudent and reasonable." (Emphasis in original.)

These assertions are incorrect. It was highly disputed by Staff that 42% of the demand charge was incurred for the actual benefit of Harrisburg customers or that a 42% "reservation of capacity" by United Cities to Harrisburg was prudent and reasonable. And, as discussed, the Commission expressly found that, applying a prudency standard to United Cities' allocation of

the total demand charge, the refund ordered was necessary to prevent the Harrisburg customers from being charged for an amount in excess of the cost of gas prudently purchased for them.

United Cities is incorrect in its argument. In the *Iowa-Illinois* case relied upon by United Cities, the Commission reviewed the collection and allocation of nuclear power plant decommissioning costs. These costs were recovered through base rates, not the PGA clause. The Commission accepted the Company's position to retain the existing allocation method rather than adopting a new method proposed by Staff, stating that "[t]his treatment will ensure the consistency among jurisdictions." The Commission did not say, as United Cities argues, that it "must accept a cost allocation which assures consistency among the states." In fact, the Commission noted the uniqueness of the situation before it. Moreover, the decommissioning allocation factor in that case was based on actual data, *i.e.,* a three-year historical average of peak demand in the two States. Finally, the Commission expressly retained "the authority to review the filed factors and supporting data each year and to suspend any increase or decrease in a decommissioning cost factor when an investigation is warranted." The Commission noted that "[c]ustomers as a whole should be benefitted by the Company's proposal because it will provide a reasonable assurance that *current realistic estimates* of decommissioning costs are being collected in Illinois." (Emphasis added.) (*Iowa-Illinois*, 105 Pub. Util. Rep. 4th at 362.) *Iowa-Illinois* does not present facts similar to the case at bar, nor did it establish a "rule" requiring multijurisdictional consistency.

The "Barnsley Order" involved United Cities' acquisition of the Barnsley gas storage field in Kentucky in 1989. One of the many issues presented for resolution

in that proceeding was the allocation of the costs of the Barnsley storage field between the Illinois and Tennessee areas which utilized it. A study conducted after United Cities' acquisition of Barnsley regarding projected peak day demands for the 1990-91 heating season indicated that Barnsley was utilized 75.94% for Tennessee operations and 24.06% for Illinois operations. United Cities therefore sought approval of the proposal that the Barnsley costs be allocated accordingly between the two States both in base rates and in PGA recovery. The Commission approved this proposal over the objections of Staff. The Commission also directed United Cities to review and evaluate the existing Illinois/Tennessee allocation at the time of its next Tennessee rate case and to submit any such study to Staff for its review at the same time the study would be submitted for review in Tennessee.

Although the result in Barnsley was consistency in the allocation figures used for Tennessee and Illinois, the Commission neither enunciated nor based its decision on a "rule" of multijurisdictional consistency. Significantly, the projections in Barnsley were based upon a current study conducted in preparation for the Barnsley proceeding. In the instant case, the allocation was based upon a 1984 study which United Cities failed to update despite, as the Commission found from data presented, a clear shift in actual sales and customers and peak day demand from Harrisburg to Tennessee between 1985 and 1989. Additionally, while the Commission accepted United Cities' projections in approving the Illinois allocation, it directed—as it did in this case and in *Iowa-Illinois*—that United Cities review and reevaluate its allocation at the time of the next Tennessee rate case and to concurrently submit that data to Staff for its review.

As pointedly stated by the Commission in its order

in the present case, its adoption of the allocation method in the Barnsley order was "based upon the facts and circumstances in that docket. That allocation methodology is not binding on this Commission if a change in circumstances has arisen that warrants a different methodology." As support for its position, the Commission cited *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513, wherein this court stated:

"The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding."

Thus, it is clear that the Commission did not subscribe to the existence of a "rule" requiring multijurisdictional consistency or to a rule requiring it to adhere to the precedent of orders it entered in prior proceedings. Although multijurisdictional consistency may be a desirable goal, it is not a rule which obligates the Commission to approve charges which have been improperly attributed to Illinois customers merely to achieve consistency with another State which employs a different cost recovery system.

In a closely related contention, United Cities argues that the Commission erred in disregarding its own precedent because it is bound by its prior orders under the doctrine of *res judicata.* The doctrine of *res judicata* has no application in this case.

The essential elements of *res judicata* are a final judgment on the merits rendered by a court of competent jurisdiction, an identity of cause of action, and an identity of the parties or their privies. The presence of these three elements renders the judgment conclusive as to the rights of the parties and their privies. *People ex rel. Burris v. Progressive Land Developers, Inc.* (1992), 151 Ill. 2d 285, 294; see also *People ex rel. Hartigan v.*

*Illinois Commerce Comm'n* (1993), 243 Ill. App. 3d 544, 549.

In the present case, no prior order of the Commission has considered or resolved the issue of United Cities' 1988 reconciliation of PGA costs and revenues. The instant proceeding is distinguishable from *Iowa-Illinois*, Barnsley, or any other prior cases or reconciliation proceedings decided by the Commission. Moreover, in addition to the language quoted above, the court in *Mississippi River Fuel Corp.* expressly held that "orders [of the Commission] are not *res judicata* in later proceedings before it." *Mississippi River Fuel Corp.*, 1 Ill. 2d at 513.

United Cities next contends that the Commission violated the prohibition against confiscation by disallowing recovery of legitimate operating expenses, *i.e.*, the demand charge, incurred for the benefit of its customers. United Cities cites numerous cases for the proposition that a rate of return which does not produce sufficient income to meet operating expenses is confiscatory. (*E.g.*, *Sprague v. Biggs* (1945), 390 Ill. 537.) United Cities also argues that the Commission cannot "ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers" (*State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.* (1920), 291 Ill. 209, 234), and that the Commission is "without authority to arbitrarily reduce an allowance shown to have been actually paid *** unless there is a further showing that, for some reason, the amount was improperly increased over a legitimate cost." *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 61-62.

Section 9—101 of the Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—101) requires that rates and charges for services shall be just and reasonable. A public utility is entitled to just and reasonable compensation for the ser-

vice given to the public; but on the other hand, the public is entitled to demand that no more be exacted from it than the services rendered are reasonably worth. *Springfield Gas*, 291 Ill. at 217-18. See also *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31 (allowing costs of maintenance of mains where the evidence showed that they were related to an extremely cold winter; but disallowing certain costs of promoting the utility's sales of gas appliances as being unrelated to the utility's primary service, the provision of gas); *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 478 (utility's lobbying expenses, charitable contributions and club dues were not legitimately incurred operating expenses recoverable from customers); *Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 560-61 (excluding contributions in aid of construction made by consumers from the fair value of a plant for rate-fixing purposes, and disallowing officers' salaries found to be excessive for rate purposes); *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227 (holding that the utility has the burden of proving that any operating expense for which it seeks reimbursement directly benefits the ratepayers or the services which the utility renders).

The Commission's disallowance of 13.31% (42% minus the 28.69% found to be the proper percentage) of the Texas Eastern demand charge which United Cities allocated to the Harrisburg service area did not constitute confiscation. United Cities' Harrisburg customers should not be required to pay for more than the service provided is reasonably worth or for costs not legitimately incurred for their benefit.

Contrary to United Cities' insistence that "[n]o one has questioned that the capacity [of gas] reserved for [the Harrisburg service area] was not reasonably

forecasted," the Commission expressly found that United Cities had demonstrated indifference toward its Harrisburg customers by failing to review its allocation percentages despite a clear shift in sales and customers from Harrisburg to Tennessee from 1985 to 1989. The Commission determined, and we agree, that such indifference by United Cities was a factor which rendered Staff's proposed adjustment and refund justifiable.

Moreover, we find no merit in United Cities' argument that the demand charge is like a premium for insurance and that the Harrisburg customers received the full benefit of what they were charged by virtue of having the security of 42% of total capacity reserved for them. As it has been noted, the allocation percentages were not only based on an outdated study but were unilaterally assigned by United Cities in its own internal bookkeeping methodology. The same argument United Cities makes could be made to support any percentage "reserved" by United Cities for the Harrisburg service area. The question is not whether United Cities "reserved" 42% for the Harrisburg customers, but whether that amount of reservation was reasonable and prudent and based upon on actual need. If, as the Commission found, such "reservation" was excessive and imprudent, then the 42% reservation did not constitute a benefit. The responsive analogy by the Commission is more fitting, *i.e.*, that United Cities was in the position of an insurer which, despite knowing that its insured should be classified as a better risk deserving a resulting lower premium, continued to charge the higher premium.

United Cities also repeatedly notes that it cannot recover the amount disallowed by the Commission from its Tennessee customers because of the nature of Tennessee's ratemaking scheme. As Staff argued, however, it was United Cities' own failure to update its

allocation figures that resulted in the overcollection from Illinois customers which effectively subsidized United Cities' Tennessee operations. The manner in which Tennessee governs its utilities is not controlling on the Commission or courts in the governance of utilities which operate in this State.

United Cities also contends that the Commission's order "traps" the demand costs in violation of the "filed rate doctrine." As this court explained in *General Motors Corp. v. Illinois Commerce Comm'n* (1991), 143 Ill. 2d 407, 416: "[I]n enacting the Natural Gas Act [15 U.S.C. § 717 *et seq.* (1988)] Congress gave exclusive and plenary authority to FERC to regulate the transportation and sale for resale of natural gas moving in interstate commerce, including the power to regulate interstate natural gas purchases." The United States Supreme Court applied Congress' intent to occupy the field in regulating interstate sales of wholesale gas in pronouncing the "filed rate doctrine," which is a rule of Federal preemption. In *Nantahala Power & Light Co. v. Thornburg* (1986), 476 U.S. 953, 90 L. Ed. 2d 943, 106 S. Ct. 2349, the Supreme Court held that in determining intrastate retail rates, a State regulatory commission must give binding effect to interstate rates filed with or fixed by FERC. The filed rate doctrine prohibits a State commission from "trapping" FERC-approved wholesale costs, which would occur if a State commission prevented a distributor from fully recovering those wholesale costs in retail rates. States may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates. *General Motors Corp.*, 143 Ill. 2d at 421.

At issue in *General Motors* were unavoidable "take or pay" costs under which pipelines were required to purchase from gas producers a certain amount of gas each year or pay for any gas not taken. Because of a

change in FERC policy which allowed distributors to purchase gas directly from the producer without using the pipeline as a wholesaler, the pipelines incurred huge contract liabilities under the take-or-pay provision for gas they could not sell. To rectify the situation, FERC established a framework for pipelines to recover a portion of the take-or-pay costs from distributors, who in turn passed the costs on to their customers. The court affirmed the Commission's ruling that the filed rate doctrine preempted it from not allowing distributors to recover the costs imposed on distributors as a result of the FERC order. The court noted, however, that States retain the authority to review the prudence of a distributor's actions in incurring FERC-approved supply charges when the distributor had a choice whether to incur the charge. *General Motors Corp.*, 143 Ill. 2d at 421-22.

In the present case, the Commission did not rule that the Texas Eastern demand rate, which was approved but not mandated by FERC, was excessive or unreasonable. Rather, it was the percentage of that rate which United Cities allocated to its Illinois customers that the Commission did not approve. The filed rate doctrine does not require the Commission to allow United Cities to charge Illinois customers for costs exceeding those which are properly and prudently allocable to them. Had United Cities properly tracked its customers and sales, and updated the allocation percentages assigned in 1984, it would not face the potential of recovering less than 100% of its total costs of providing gas to its Tennessee and Illinois customers.

United Cities makes the further contention that the Commission committed prejudicial error by retroactively changing its own policy as to United Cities' reconciliation allocation method, and that even assuming the Commission could depart from established policy, it

failed to make sufficient findings of a change in circumstances to justify such a departure. We reject this contention. As noted by the appellate court below, the Commission is not prohibited from changing its policies provided that such change is not done in an arbitrary or capricious manner. See 225 Ill. App. 3d 771.

Moreover, notwithstanding references in the order to a change in allocation methodology from what was adopted in the Barnsley Order, the order does not in substance change the method used by United Cities in allocating its total demand charges. The order variously states, "Staff is not proposing a change in the allocation methodology, but rather an update to the peak demand upon which the allocation factor has always been based"; and that "[Staff] indicated that the issue in this case is whether more current data should be used in the implementation of [United Cities'] allocation method." Further, the order directs United Cities to review its allocation factors at the time of each Tennessee rate case and submit the results of its study to the Commission for concurrent review in Illinois.

Thus, the order did not retroactively change the underlying allocation methodology. It merely denied recovery of charges which, by reason of United Cities' failure to utilize current data in its allocation methodology, were improperly apportioned to the Harrisburg service area. United Cities may continue to use the same methodology it has used in the past in allocating its total demand charges. However, the demand charges recovered from Illinois customers, as a cost of gas purchased, are subject to reconciliation under section 9—220. As noted by John Link, minimal differences between projected and actual costs would likely not prompt Staff to propose an adjustment in a reconciliation proceeding, and that if it were determined that Illinois customers had paid less than their appropriate

share of demand charges, an upward adjustment would be proposed which, if approved by the Commission, would allow United Cities to recover those costs through the PGA clause.

Finally, we disagree with United Cities' argument that the Commission failed to make sufficient findings to justify its decision, and with United Cities' contention that the decision was against the manifest weight of the evidence. The Commission's order summarized and reviewed the evidence and arguments presented by both sides and, in its conclusion, it responded to each of United Cities' reasons for opposing Staff's proposed adjustment. The Commission found that the Barnsley Order and the *Iowa-Illinois* case were factually distinguishable. The order observed that since the time of the study presented to the Tennessee Commission in 1985, which allocated 42% of demand charges to Harrisburg, various events occurred. Evidence submitted showed that there had been a steady increase in United Cities' Tennessee customers and in sales to them, and a corresponding decrease in customers and sales in Harrisburg between 1985 and 1989 when the allocation percentages were finally revised. A Staff exhibit, which included data provided by United Cities, showed that between 1985 and the reconciliation year of 1988, there had been a 12.4% increase and decrease in customers in Tennessee and Harrisburg respectively, and a 5.5% rise and decline in therm (units of gas) sales in Tennessee and Harrisburg respectively. The exhibit also showed that the peak day demand in Tennessee had risen from 58% to 71.3% of the total demand, and that it had dropped from 42% to 28.7% in the Harrisburg service area. The Commission found that such evidence, which was not present in the Barnsley case, constituted a change in circumstances which justified departure from the decision in that order. The Commission also found it significant that

United Cities had failed to review the allocation between 1985 and 1988, notwithstanding that there had been another rate case in Tennessee during that period. The Commission characterized this inaction as a demonstration of "indifference toward [United Cities'] Illinois customers," which, coupled with the actual shift in customers and sales from Illinois to Tennessee and the resulting impact of these factors upon Illinois customers, also justified a departure from past practices. The order also noted and rejected United Cities' contention that the proposed adjustment would violate the prohibition against retroactive ratemaking, reasoning that because this was a reconciliation proceeding, it was authorized under section 9—220 to order the adjustment. The Commission concluded that Staff's proposed adjustment was reasonable, and that it was necessary to prevent the Harrisburg customers from being billed in excess of the cost of gas prudently purchased for them.

The Commission's findings must be taken as *prima facie* correct (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(d)) and are entitled to significant weight and deference due to the Commission's expertise in the area of utility ratemaking (*Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 370-71; *Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523). We cannot say, in the present case, that the Commission's findings were not supported by substantial evidence or that they were contrary to the manifest weight of the evidence.

United Cities also contends that the Commission's order improperly discriminates against it as an interstate utility which provides gas to service areas in both Illinois and Tennessee. United Cities argues that the Commission allows wholly intrastate utilities to recover all the demand costs which were projected at the time of the execution of the long-term contracts with pipeline

suppliers, regardless of the amount of actual demand. In contrast, United Cities maintains, the Commission's order prevents it from recovering 100% of its total demand costs as between the two States it serves under a single pipeline contract.

We perceive no improper discrimination against United Cities based upon its status as an interstate gas utility. As the Commission points out, intrastate gas utilities are also subject to prudence and reconciliation review under section 9—220. United Cities has produced no evidence supporting its claim that if an intrastate utility operated in two service areas under a single pipeline contract, the reconciliation requirements would not be the same as those required of United Cities, or that if it were determined that one service area was being overcharged its appropriate share of total demand charges an adjustment would not be ordered. We agree with the Commission that the ruling in this case does not disregard that United Cities operates in two jurisdictions. It directs United Cities to review its allocation data and, if necessary, to update its allocation percentages at the time of each rate case in Tennessee and to contemporaneously submit that data for review in Illinois. The voluntary undertaking by United Cities of that or a similar procedure would have avoided the situation which arose in this case. United Cities' alleged inability to recover 100% of the total demand charges results not from any arbitrary or discriminatory treatment by the Commission but because United Cities used outdated allocation data and percentages in projecting the Harrisburg area demand for 1988 and in its subsequent billing of Harrisburg customers for amounts which, according to the evidence, should have been charged to its Tennessee customers. That there are aspects of operating under the different regulatory schemes of both Illinois and Tennessee which intrastate

utilities do not encounter does not excuse an interstate utility, such as United Cities, which chooses to do business in Illinois from conforming to Illinois regulations, or justify it in charging Illinois customers for PGA gas costs which cannot be reconciled with revenues received.

United Cities' final contention is that the Commission erred in imposing interest on the ordered refund of $260,553. United Cities relies upon *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, in which the court observed that neither the predecessor of section 9—220 nor the rule included in the Commission's order adopting the UFAC provided for interest on fuel reconciliation refunds for overcollections or undercollections.

In contrast to the UFAC at issue in *Business & Professional People*, the PGA clause, which was adopted by the Commission in 1982 in General Order 212 and codified as 83 Ill. Adm. Code § 525.60 (1982), expressly provides in the R4 factor of the refund adjustment formula for interest of $6^2/_3\%$ to be applied to the total of other specified factors in the refund adjustment formula. This interest factor has been in effect since 1983. Thus, the ruling in *Business & Professional People* does not apply. Moreover, because section 36 of the prior Public Utilities Act was recodified as section 9—220 in 1985, more than two years after the Commission adopted the PGA clause, a legislative intent to permit interest on PGA refunds is presumed.

For the reasons stated, the judgment of the appellate court affirming the Commission's order is affirmed.