ARCHER-DANIELS-MIDLAND COMPANY *et al.*, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Third District   No. 3—97—0170

Opinion filed November 24, 1997.—Modified on denial of rehearing December 31, 1997.

Edward C. Fitzhenry, Jr. (argued), of Lueders, Robertson & Konzen, of Granite City, for petitioners.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

David J. Rosso, Christopher W. Flynn (argued), and Thomas D. Brooks, all of Jones, Day, Reavis & Pogue, of Chicago, for respondent Central Illinois Public Service Company.

Edward J. Griffin and W. Michael Seidel, both of Defrees & Fiske, of Chicago, for respondent Central Illinois Light Company.

JUSTICE BRESLIN delivered the opinion of the court:

Petitioners Archer-Daniels-Midland Company, Marathon Oil Company and Quantum Chemicals Company, collectively referred to as the Illinois Industrial Energy Consumers (IIEC), appeal an order of the Illinois Commerce Commission (Commission) which approved respondent Central Illinois Public Service Company's (CIPS) modification of a fuel supply contract pursuant to section 8—508 of the Illinois Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 1996)). On appeal, the IIEC contests the Commission's findings, as

well as its authorization for CIPS to recover a $70 million fuel contract buy-out charge and associated carrying charges through CIPS's fuel adjustment clause (FAC). For the reasons that follow, we reverse.

## BACKGROUND

This case follows the Commission's approval of CIPS's plan to address an inefficient coal supply contract and corrosion at its CPS Newton I generating unit. In 1975, CIPS and AMAX Coal Company entered into a long-term high-sulfur coal supply contract. Through the years, the contract, which the parties refer to as the Delta Mine Contract, had been amended from time to time, with the most recent amendment occurring in 1991.

The Delta Mine Contract provided that CIPS would purchase a minimum of 1.3 million tons of coal annually from AMAX through December 31, 2002, for use at its Newton I unit. The agreement established an initial price of coal which was adjusted periodically pursuant to specific formulas in the contract. In 1993, when the contract price for high-sulfur coal exceeded the prevailing market prices for high and low-sulfur coal, CIPS initiated negotiations with AMAX to restructure their agreement.

At the time, the contract allowed AMAX to deliver high-sulfur coal from alternate sources in Illinois as long as it was of substantially the same or better quality. CIPS could not designate the alternate source, and any savings incurred by the lower cost of coal would inure solely to AMAX since the contract price did not adjust to reflect the actual cost to AMAX for purchasing and delivering alternate-source coal. Accordingly, due to the lowering trends in the coal market, CIPS wanted to ameliorate its position.

In addition to changes in market prices, CIPS needed to consider the deteriorating condition of its flue gas desulfurization facility, referred to as the "scrubber," at the Newton I unit. The scrubber reduced sulfur dioxide and allowed CIPS to burn high-sulfur coal in compliance with environmental laws and regulations. In 1993 it became apparent that corrosion caused by its operation was seriously impacting the Newton I unit's operation and facility. An evaluation of the scrubber determined that it required a complete renovation in order to operate safely and efficiently. The estimated cost of the renovation was $70 million.

Due to the market trends and the deteriorating scrubber, CIPS had to decide whether and how to restructure the Delta Mine Contract and whether to renovate or retire the scrubber. Any restructuring had to be consistent with a decision regarding the scrub-

ber. If CIPS decided to retire the scrubber at any time during the contract, the restructured contract would have to arrange for delivery of low-sulfur coal, which does not require a scrubber. An analysis of cost savings during the contract's remaining term was therefore necessary.

CIPS identified three possible scenarios which it analyzed to determine the maximum possible fuel cost savings. It could: (1) renovate the scrubber and maintain the Delta Mine Contract (base case); (2) renovate the scrubber, restructure the Delta Mine Contract and purchase high-sulfur coal at market prices (high-sulfur option); (3) retire the scrubber and restructure the Delta Mine Contract for delivery of low-sulfur coal at market price (low-sulfur option).

The negotiations concluded with three restructuring options for CIPS. It could: (1) use substitute coal at contract price; (2) pay AMAX the present value of $70 million during the remaining term of the restructured agreement (AMAX's expected profit from the contract) and market price for substitute coal (high or low sulfur) in addition to 9% interest for AMAX's financing of the $70 million; or (3) pay AMAX $70 million, finance the payment itself at approximately 7.25%, and pay market price for substitute coal. CIPS performed an analysis of the present value of the revenue requirements (PVRR) which took into account the investments and expenses associated with each option. CIPS's study concluded that the third restructuring option combined with the low-sulfur option (which retires the scrubber) provided higher fuel cost savings and nonfuel cost savings than the other choices. It was determined that the net fuel savings would total approximately $14 million over the remaining life of the contract and that such savings would be passed on to customers.

An amendment incorporating these terms was included in the agreement. Under the new terms, CIPS could locate and negotiate with third-party suppliers for the purchase of substitute coal at market prices and AMAX would then contract with the supplier and resell the coal to CIPS with no markup, thus giving CIPS the benefit of the differential between the contract and market prices. The restructured agreement was made contingent on CIPS acquiring approval from the Commission to recover the restructuring fee and related carrying costs (finance costs) as a cost of fuel through CIPS's FAC. The FAC is a statutorily authorized automatic adjustment clause that permits a utility to recover fuel expenses from customers, without consideration of its operating costs and overall revenue, to counterbalance fluctuations in the costs of fuel used to generate electric power. It also allows fuel cost savings to be passed on to consumers without the need for rate adjustment proceedings. CIPS

pledged to cap its FAC recovery so that if the restructured agreement's costs exceeded the costs of the contract as it previously existed, CIPS would be responsible for the difference. This would prevent customers from paying higher FAC charges under the restructured agreement than under the prior agreement.

CIPS initiated proceedings with the Commission, seeking its approval as required by section 8—508 of the Public Utilities Act (220 ILCS 5/8—508 (West 1996)). Following an extensive hearing to review CIPS's proposal, the Commission agreed with CIPS and found that the low-sulfur pricing option produced the lowest PVRR over a 20-year period, and that CIPS would realize substantial fuel cost savings for ratepayers over the remaining term of the contract. The Commission concluded that, based on the rationale in its decision in *Illinois Commerce Comm'n v. Interstate Power Co.*, Ill. Commerce Comm'n Order 92—0335 (September 25, 1996), wherein it found that "it is acceptable that buy-out costs track the fuel cost savings through the fuel adjustment clause, because the buy-out costs were incurred directly in realizing fuel costs savings," CIPS could recover the restructuring fee and associated carrying costs through CIPS's FAC. Thus, recovery of the restructuring costs and the associated carrying costs through the FAC were approved. The IIEC appeals.

## DISCUSSION

### I. STANDARD OF REVIEW

■■ Our courts give great deference to the Commission's decisions as they are " 'judgment[s] of a tribunal appointed by law and informed by experience.' " *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12, 643 N.E.2d 719, 725 (1994), quoting *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523, 165 N.E.2d 329, 332 (1960). When reviewing the Commission's orders, we are limited to considering whether: (1) the Commission acted within its authority; (2) adequate findings were made to support the decision; (3) the decision is supported by substantial evidence; and (4) state or federal constitutional rights have been infringed. *Citizens United For Responsible Energy Development, Inc. v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 673 N.E.2d 1159 (1996). The Commission's factual findings are considered *prima facie* correct and may be reversed only upon a demonstration that the findings are not supported by substantial evidence. 220 ILCS 5/10—201(d), (e)(iv) (West 1996); *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 592 N.E.2d 1066 (1992). When an interpretation of the Commission's own rules is at issue, the Commission's interpretation is held *prima facie* reasonable (220 ILCS 5/10—201(d) (West 1996);

*United Cities Gas Co.*, 163 Ill. 2d at 11, 643 N.E.2d at 725), and this court may not interfere unless the administrative construction is clearly erroneous, arbitrary, or unreasonable (*Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 610 N.E.2d 1356 (1993); *Ekco, Inc. v. Edgar*, 135 Ill. App. 3d 557, 482 N.E.2d 130 (1985); *Inwang v. Community College District No. 508*, 117 Ill. App. 3d 608, 453 N.E.2d 896 (1983)). Similarly, while deference is granted to an agency's interpretation of a statute that it is charged with administering and enforcing (*Wyckoff-Dike v. Peoria Police Pension Fund Board of Trustees*, 286 Ill. App. 3d 655, 678 N.E.2d 4 (1997)), this court is not bound by the agency's interpretation and it will be rejected when erroneous (*Citizen's Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 683 N.E.2d 938 (1997); *Cherington v. Selcke*, 247 Ill. App. 3d 768, 617 N.E.2d 514 (1993)). The burden of proof on all issues raised on appeal rests with the appellant. 220 ILCS 5/10—201(d) (West 1996)); *United Cities Gas Co.*, 163 Ill. 2d at 11, 643 N.E.2d at 725.

## II. THE FUEL ADJUSTMENT CLAUSE

The first issue on appeal is whether the restructuring costs and the associated finance costs may be properly recovered through the FAC.

■ In relevant part, section 9—220 of the Act provides:

"Notwithstanding the provisions of Section 9—201, the Commission may authorize the increase or decrease of rates and charges based upon changes in the cost of fuel used in the generation or production of electric power *** through the application of fuel adjustment clauses ***." 220 ILCS 5/9—220 (West 1996).

In 1981 the Commission adopted the uniform electric fuel adjustment clause (see *Adoption of Uniform Fuel Adjustment Clause(s)*, Ill. Commerce Comm'n Order 78—0457 (November 10, 1981) (UFAC order)), and codified the Uniform Electric Fuel Adjustment (UFAC) at 83 Ill. Adm. Code § 425 (1996). With respect to fuel costs which can be recovered through an electric utility's FAC, section 425.40(c)(1) states:

"The cost of fuel shall include the *direct cost of fuel* delivered at the generating plants. The direct fossil fuel costs are limited to costs entered into fuel expense Accounts #501 and #547 which have been cleared upon consumption from Fuel Stock account #151." (Emphasis added.) 83 Ill. Adm. Code § 425.40(c)(1) (1996).

### Direct Costs vs. Indirect Costs

The IIEC asserts that the language in the rule clearly prohibits recovering the buy-out costs from customers through the FAC

because such costs are not "direct costs" of fuel delivered at CIPS's generating plant. IIEC urges that the proper method to recover the costs of the restructuring is by initiating a rate case with the Commission. It contends that the FAC was never intended to be employed as the Commission has done in the instant case.

CIPS argues that the restructuring costs and carrying costs are "direct costs" within the meaning of the UFAC because "they are invoiced costs incurred to obtain the restructured agreement with AMAX and are, therefore, costs legitimately incurred to procure the delivery of coal under that agreement." It argues that the decision follows from a proper interpretation of the Commission's UFAC order and from the Commission's order in *Interstate Power*. To disallow the recovery through the FAC, CIPS contends, would discourage prudent management and create a disincentive to acquire the lowest possible fuel costs.

The Commission states that indirect costs principally include utility labor costs and nonfuel supplies which are incurred at the time of delivery or thereafter. The Commission asserts that any risks it had in mind when it adopted the UFAC are not at issue in the present case and that the inclusion of buy-out costs in the FAC is consistent with the Act and the Commission's rules. The Commission agrees with CIPS that to disallow recovery through the FAC would create a disincentive and would ultimately harm consumers since the lowest costs of fuel will not be sought by utilities.

Although we agree that recovery through the FAC may create an incentive for utilities to seek the lowest costs of fuel and thus potentially create greater savings for customers, we cannot agree with CIPS's and the Commission's interpretations of the Commission's rule. In the UFAC order, the Commission described the FAC's purpose as a combatant against volatile market activity. It stated:

> "The categories of costs to be passed through the FAC are those that are beyond the control of the utility, significant, and capable of being measured with certainty. \*\*\* Fuel costs represent a substantial portion of operating costs; in some instances, fuel costs alone comprise more than half of a utility's total operating costs. Any fluctuation in fuel costs has a significant impact on a utility's earnings unless some means exists to recoup those increased costs as quickly as possible. These fuel costs are a highly volatile expense item; more so than other expenses such as wages or maintenance. When the volatility factor is coupled with the magnitude of the fuel costs, one can readily conclude that the fuel adjustment clause is both a necessary and a proper regulatory tool to insure that both the customer and the utility receive the benefits

of early recognition in changes in the cost of generating electricity. *** The fuel clauses, however, are designed to take cognizance of the increased fuel costs through periodic adjustments; they are not designed to relieve or insulate the utility from all risks of doing business." *Adoption of Uniform Fuel Adjustment Clause(s)*, Ill. Commerce Comm'n Order 78—0457 (November 10, 1981).

■ Clearly, the purpose of the FAC is to protect utilities and consumers from market pressures that are not in their control. Buy-out and restructuring costs do not fall within this category of uncontrolled fluctuation. A buy-out or restructuring of the type here involves a planned disbursement agreed to in order to terminate or rearrange a contract to purchase future coal. The buy-out or restructuring thus acts as a ticket to purchase coal not otherwise available under the original agreement, in this case, the Delta Mine Contract. In no sense can this be deemed a "direct cost" of fuel within the meaning of the UFAC which should be recouped through a rate change outside the normal procedures established by the Commission for rate adjustments.

The Commission's accounting treatment of the transaction further demonstrates that recovery is not proper through the FAC. Section 425.40(c)(1) is dependent upon accounting definitions adopted by the Commission in its "Uniform System of Accounts" (83 Ill. Adm. Code § 415 (1994)). It limits the direct costs "to costs entered into fuel expense Accounts #501 and #547 which have been cleared upon consumption from Fuel Stock account #151." 83 Ill. Adm. Code § 425.40(c)(1) (1996). The purpose of account 151 is to accumulate the cost of fuel on hand. The Commission, however, determined that the buy-out costs could not be properly recorded in account 151 because they did not reflect a cost of coal on hand. This treatment confirms that the costs should not have been recovered through the FAC because they were not a recoverable expense within the meaning of section 425.40(c)(1).

The Commission and CIPS both cite *Illinois Commerce Comm'n v. Interstate Power Co.*, Ill. Commerce Comm'n Order 92—0335 (September 25, 1996), and *Monarch Gas Co. v. Illinois Commerce Comm'n*, 261 Ill. App. 3d 94, 633 N.E.2d 1260 (1994), to support their positions. Neither is of assistance. In *Interstate Power*, the Commission permitted the recovery of buy-out costs through the FAC. However, that case was unique. The recovery was completed three years before the Commission rendered its decision. A rate case would have been inappropriate under the circumstances. Ultimately, the Commission ordered that, "for the purposes of that docket only," the proper remedy was to allow recovery through the FAC, which it

found was consistent with the intent of the UFAC order and the decision in *Monarch*.

In *Monarch*, the court reversed the Commission's order adhering to the literal provisions of section 9—220. In that case, Monarch Gas Company had exceeded its maximum daily fuel purchases in order to provide gas for customers during an intense cold spell. When Monarch sought to recover its extra expenditures under the purchased gas adjustment clause (PGAC), the Commission denied its application because it found the charges were unauthorized overtake charges. The Commission thus determined that the costs were not recoverable through the PGAC and that Monarch would have to refund its customers for the unauthorized charges. On appeal, the court determined that Monarch could only have avoided such a circumstance under the Commission's rules by becoming a daily maximum quantity customer of the Natural Gas Pipeline Company of America. However, that would have resulted in a 100% increase in its customers' rates. The court concluded that the Commission's decision was improper since Monarch had done the "right thing" as demonstrated by its concern for its customers. The court held that while the order was consistent with the rules, it effectively penalized Monarch for its actions and, thus, reached a "clearly unreasonable" result. *Monarch*, 261 Ill. App. 3d at 101, 633 N.E.2d at 1266.

In the present case, we do not have the unique circumstances presented by the above scenarios. This is not a situation where a rate case was improper and regulatory lag worked to impede the process. Additionally, this is not a case where the utility is being penalized for its prudent conduct. CIPS came to the Commission seeking approval of its restructuring and its method for accounting for the transaction. In short, principles of equity do not require this court to step in and find that the rules should not be followed. To the contrary, what we are holding is that the regulations must be followed. If the Commission deems recovery through the FAC in this type of case desirable, it may alter its rules, " 'but it must follow the procedures set forth in its rules and the Act.' " *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 240, 585 N.E.2d 1032, 1060 (1991), quoting *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 226, 555 N.E.2d 693, 708 (1989). Until the Commission modifies its rules to include restructuring costs as a cost recoverable through the FAC, we hold that such a recovery is inappropriate.

### Single-Issue Ratemaking

IIEC also argues that the Commission's decision resulted in

improper single-issue ratemaking because it approved recovery of the restructuring costs without analyzing CIPS's overall operating expenses. We agree.

■ The rule against single-issue ratemaking makes it improper to consider changes in particular portions of a utility's revenue requirement in isolation. *Business & Professional People*, 146 Ill. 2d at 244, 585 N.E.2d at 1061. The rule ensures that the utility's revenue requirements are based on the utility's aggregate costs, rather than certain specific costs related to a component of its operation. This is necessary because certain expenses for one aspect of a utility's business may be offset by savings in another area, thus removing the need for greater revenue. *Business & Professional People*, 146 Ill. 2d at 244-45, 585 N.E.2d at 1061-62; *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 620 N.E.2d 1141 (1993).

Because recovery through the FAC is improper, compensation for the restructuring costs must be acquired through a rate modification pursuant to section 9—201 (220 ILCS 5/9—201 (West 1996)). In a rate case, the Commission will have to determine what amount should be recovered due to the restructuring following a review of CIPS's aggregate revenue requirement. For example, its expenses incurred in the transaction with AMAX may possibly be offset by savings from retiring the scrubber. However, until such an analysis is performed pursuant to the procedures set forth in section 9—201, a change in rates is inappropriate and, under the circumstances, results in improper single-issue ratemaking.

## CONCLUSION

In addition to the arguments we have addressed, the IIEC also argues that the Commission's findings are not supported by substantial evidence and that the approval of the FAC recovery is an unauthorized preapproval in violation of section 9—220 and amounts to illegal incentive ratemaking. In light of our decision above, we need not address these issues. To summarize, we hold that the recovery of the restructuring costs may not be recovered through the FAC because such expenses are not direct costs as contemplated by the "Uniform Electric Fuel Adjustment" (83 Ill. Adm. Code § 425 (1996)), and the failure to consider such buy-out expenses in terms of CIPS's aggregate costs results in improper single-issue ratemaking. Accordingly, we reverse. However, due to the potential inequitable consequences resulting from this reversal, this decision is prospective only.

For the foregoing reasons, we hereby reverse the order of the Illinois Commerce Commission.

Reversed.

MICHELA and SLATER, JJ., concur.